# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 3, 2008

## KELVIN JERMAINE DOWELL v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Tipton County**
**No. 4910      Joseph H. Walker, Judge**

---

**No. W2007-02814-CCA-R3-PC  - Filed September 5, 2008**

---

The petitioner, Kelvin Jermaine Dowell, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing that his trial counsel provided ineffective assistance by presenting two inconsistent defense theories at his trial.  Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

J. Barney Witherington, IV, Covington, Tennessee, for the appellant, Kelvin Jermaine Dowell.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The petitioner was convicted by a Tipton County jury of first degree murder and abuse of a corpse and sentenced to life imprisonment.  His conviction was affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal.  State v. Kelvin Jermaine Dowell, No. W2005-00588-CCA-R3-CD, 2006 WL 369276, at *1 (Tenn. Crim. App. Feb. 17, 2006), perm. to appeal denied (Tenn. June 26, 2006).  Our direct appeal opinion provides the following summary of the evidence presented at trial:

> On April 28, 2004, James Russell, Jr.  ("Junior"), Reggie "Pee Wee" Dowell, Jeff Mosley, Rafael Wakefield, Courtney "Tiny" Lemons and the [petitioner], were playing basketball in the Wilkinsville Trailer Park.  At some point during the basketball game, the victim, Javier "Jay" Demarco Brookins, interrupted the basketball game and had a conversation with the [petitioner], who supplied the victim's crack cocaine.  At the conclusion of the conversation, the victim returned to his trailer, and the [petitioner] and the other basketball players followed the victim.  Apparently, the victim had offered to sell his stereo to the [petitioner] or give it to him as payment.  When the victim disappeared inside his trailer and did not re-emerge despite the [petitioner]'s demands that he do so, the [petitioner] became angry and reported that he was "going to get" the victim.

The group then resumed their basketball game until the victim returned approximately 30 to 45 minutes later carrying either a broken golf club or a metal baseball bat. James Russell, Jr., who was armed with a pistol, met the victim and began yelling and waving his pistol at him. Mr. Russell then put his pistol away, and the victim and the [petitioner] had a less-heated discussion. The victim then headed across a nearby field in the direction of his trailer with the [petitioner], Mr. Russell, and "Pee Wee" Dowell. Mr. Dowell overheard Mr. Russell tell the [petitioner] "don't let him talk to y'all like that. Do that ——-." Mr. Russell then heard a gunshot and began to run from the field. As Mr. Russell looked over his shoulder, he saw the [petitioner] standing in front of the victim, who was kneeling. Later, the [petitioner] told Mr. Dowell that the victim "had lost his life over something stupid."

Rafael Wakefield, a fellow resident of the Wilkinsville Trailer Park, was walking to the [petitioner]'s trailer when he overheard Mr. Russell instruct the [petitioner] to shoot the victim. Moments later, Mr. Wakefield heard gunshots and then saw Mr. Russell emerge unarmed from behind a trailer looking shocked and fearful. Seconds later, the [petitioner] approached Mr. Wakefield and informed him that he needed to use his pick-up truck. Mr. Wakefield complied, and the [petitioner] and Mr. Russell loaded the victim's body, which was wrapped in a black tarp, into the pick-up truck. Mr. Wakefield then drove to a landing by the Mississippi River where the group hoisted the victim over the guardrail, and the victim rolled into the Mississippi River. Thereafter, the group visited a car wash where they removed the victim's blood from Mr. Wakefield's vehicle.

Mr. Wakefield heard the victim snoring both when loading him into the pick-up truck and when dumping him into the Mississippi River. Additionally, the [petitioner] told Mr. Dowell and Keith Russell that the victim was still breathing after he was shot. However, Medical Examiner Dr. Bruce Levy testified that he was unable to determine whether the victim died of drowning but opined that the victim's gunshot wounds were fatal and would have killed the victim regardless whether he was subsequently placed in a river. Doctor Levy further explained that the victim's snoring reflected his comatose state.

After the victim's body was discovered floating in the Mississippi River, the subsequent investigation and examination of the body revealed the victim's identity and residence in the Wilkinsville Trailer Park. The local police, assisted by Tennessee Bureau of Investigation Special Agent Donna Turner, canvassed the trailer park and interviewed all residents. Thereafter, investigators asked James Russell, Jr., Rafael Wakefield, and the [petitioner] to come to the sheriff's office for questioning. They did so and gave sworn statements in which each individual confessed his role in the victim's murder and disposal of his body. Thereafter, all three were arrested and charged with abuse of a corpse, and the [petitioner] was also charged with first degree murder. The state later dropped the charges against Mr. Russell and Mr. Wakefield in exchange for their trial testimony about the [petitioner]'s role in the victim's murder.

Despite his sworn statement in which the [petitioner] admitted to shooting the victim when he believed the victim was going to hit him with the baseball bat he was carrying, the [petitioner] later maintained his innocence, and his trial defense theory was that James Russell, Jr. had shot the victim.

Id. at *1-2.

On June 21, 2007, the petitioner filed a *pro se* petition for post-conviction relief in which he alleged that trial counsel was ineffective for, among other things, failing to adequately investigate the factual and legal issues involved in his case and failing to develop an adequate defense. Post-conviction counsel was appointed and subsequently filed a notice that no amendment to the petition would be filed. At the evidentiary hearing, trial counsel testified that he was involved in the petitioner's case from the preliminary hearing through the direct appeal. He said that he met with the petitioner three or four times prior to trial, during which time they discussed possible defenses to the charges. The petitioner told him that the victim had threatened and struck him with a baseball bat and that he had pulled the gun from his pocket and shot the victim as he was falling backward. Based on this account, which was essentially the same as the one the petitioner had provided in his statement to police, their defense strategy became one of self-defense.

At a later point, however, a twelve-year-old eyewitness came forward who was prepared to testify that it was James Russell and not the petitioner who shot the victim. Trial counsel said that the petitioner expressed his preference for going forward with the latter defense and that the witness testified to that effect at trial. Trial counsel explained how he attempted to reconcile the petitioner's statement with the new defense strategy of attempting to show that he had not fired the fatal shots:

> Basically that his statement was the product of the people that he was around telling him, Hey, you are just eighteen, you won't get a lot of trouble out of this. And that they had convinced him that was the best route to take. And so when he was interviewed he said, Yeah, I did it. And they had said, in their statements, That's right, he did it.

Trial counsel testified that he pointed out to the jury that the petitioner had said in his statement that the covering wrapped around the victim was a gray or white tarpaulin when it fact it was black plastic. He then argued that

> if he was going to tell a detail, if he really was there and did this, why would he lie about this? Pretty obviously, he's been told certain things, but the folks that told him this forgot to tell him what color the tarpaulin was. And so he just said it was a white painter's tarp kind of thing, and that was wrong.

Trial counsel testified that although the petitioner was interested in having his statement suppressed, he saw no basis for a suppression motion. He said that the petitioner knew about his Miranda rights, had signed the waiver of rights form and the statement, and indicated that no one had made any overt threats to him. On cross-examination, he agreed that the petitioner's statement allowed him to introduce "his theory of some sort of self-defense" without the petitioner's having to take the stand in his own defense. He said that the petitioner had been convicted in juvenile court of having shot someone at the direction of Mr. Russell and that he "certainly didn't want to open any doors about having guns or where he got guns and what his function was . . . with regard to Mr. Russell and his business enterprise."

The petitioner testified that he and trial counsel met two to three times for thirty to forty-five minutes each time. He said that whenever he tried to bring up issues he wanted addressed, trial counsel would become upset and end the conversation. For example, when he attempted to tell counsel about the coercive atmosphere during his interview with the police, counsel became upset, telling him that he was not "going to be going through this" and that the petitioner would have to find someone else to represent him. Counsel never explained why he became upset and appeared to the petitioner to have some sort of personal problem. The petitioner said that he and counsel did

-3-

not discuss any defense strategy and that he never agreed to the strategy counsel employed at trial. He also never discussed which witnesses counsel intended to call. On cross-examination, he testified that he was not able to present a viable defense because he and trial counsel had a conflict and were not on good terms.

On October 26, 2007, the post-conviction court entered a written order denying the petition on the basis that the petitioner had not met his burden of demonstrating either a deficiency in counsel's performance or any prejudice resulting to his case. Thereafter, on December 6, 2007, the petitioner filed an untimely notice of appeal to this court.

## ANALYSIS

On appeal, the petitioner argues that trial counsel provided ineffective assistance by presenting dual defenses that were "patently inconsistent," thereby rendering his defense strategy "inherently unworkable and doomed to failure." The State first argues that the petitioner has waived appellate review by his failure to file a timely notice of appeal. The State further argues that trial counsel proceeded on the sole defense theory that the petitioner did not shoot the victim and "made a strategical decision when he addressed the initial self-defense statement to explain the change in the defense theory at the time of trial."

In this matter, the State argues, and the petitioner apparently does not contest, that the post-conviction court filed its written findings on October 26, 2007, and the notice of appeal was filed on December 6, 2007. Pursuant to Rule 4, Tennessee Rules of Appellate Procedure, a notice of appeal shall be filed within thirty days after entry of the judgment from which an appeal is sought. In criminal proceedings, however, the notice is not jurisdictional. Accordingly, this court may review untimely appeals and determine whether the notice requirement should be waived. Tenn. R. App. P. 4. Waiver is not automatic and should only occur when "the interest of justice" mandates waiver. To hold otherwise, by summarily granting waiver whenever confronted with untimely notices, renders the thirty-day requirement a legal fiction and circumvents the rule. See Michelle Pierre Hill v. State, No. 01C01-9506-CC-00175, 1996 WL 63950, at *1 (Tenn. Crim. App. Feb. 13, 1996), perm. to appeal denied (Tenn. May 28, 1996). In this matter, the notice of appeal was untimely because it was not filed until forty-one days after the post-conviction court had made its written findings. Given the gravity of the petitioner's convictions and the length of his sentences, we conclude that, in the interest of justice, his untimely filing should be waived, and we will consider the appeal on its merits.

A post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). To establish a claim of ineffective assistance of counsel, he must meet both prongs of a two-prong test, showing both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee).

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Further, when

considering a claim of ineffective assistance of counsel, a reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

Trial counsel explained the reason for his shift in defense strategies, why he believed there was no basis for suppressing the petitioner's statement, and how he attempted to reconcile the inconsistent accounts provided by the statement and the defense witness at trial. He also explained that he thought if the jury did not accept the theory that Russell was the shooter, the petitioner's statement at least provided a means of presenting the petitioner's self-defense version of events without the risk of exposing him to potentially damaging cross-examination. The petitioner has not shown any deficiencies in counsel's decisions in this matter nor any prejudice resulting to his case from counsel's trial tactics. We conclude, therefore, that the post-conviction court properly denied the petition for post-conviction relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE